USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 03/28/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EBONY MOREHOUSE,<br><br>    Plaintiff,<br><br>        v.<br><br>PAYPAL INCORPORATED, THE BANCORP BANK, and NETSPEND CORPORATION,<br><br>    Defendants. | No. 21-CV-4012 (RA)<br><br>MEMORANDUM<br>OPINION & ORDER |

RONNIE ABRAMS, United States District Judge:

Plaintiff Ebony Morehouse brings this action against PayPal Incorporated ("PayPal"), the Bancorp Bank ("Bancorp"), and Netspend Corporation ("Netspend," and collectively, "Defendants"). She raises claims under the Electronic Fund Transfer Act ("EFTA"), the Truth in Lending Act ("TILA"), and the New York Deceptive Practices Act ("NYDPA"), as well as alleging negligent misrepresentation. Defendants move to compel arbitration and to stay these proceedings. For the reasons that follow, Defendants' motions are granted.

### BACKGROUND[1]

**I.    Plaintiff's Allegations**

Morehouse is a disabled single mother whose sole source of income is Supplemental Security Income ("SSI") payments, Social Security Disability Insurance ("SSDI") payments, and Temporary Assistance for Needy Families ("TANF") payments. Morehouse Dec. ¶ 2. All her income goes to necessities such as rent, food, and medical needs. *Id.* ¶ 3. The Social Security

---

[1] The following facts are drawn from Morehouse's complaint and from affidavits and attached exhibits submitted by both parties in connection with these motions. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (explaining which documents a court may consider on a motion to compel arbitration). All reasonable inferences are drawn in favor of Morehouse. *See id.*

Administration ("SSA") requires that social security benefits be deposited electronically. Complaint ("Compl.") ¶ 26. Until 2019, Morehouse's benefits had been deposited on a card serviced by Netspend. *Id.* Due to Netspend's poor customer service and failure to investigate charges, she closed her Netspend account. *Id.*

Morehouse created a user account on PayPal's website and applied for a PayPal prepaid card. *Id.*; Morehouse Dec. ¶ 6. When the card arrived in the mail, it had PayPal's logo on it "and a phone number to call PayPal's customer service." Morehouse Dec. ¶ 6. Morehouse does not "believe [she] received any inserts about a cardmember agreement, about who to call if [she] lost her card, or about any fees associated with the card." *Id.* She saved the customer service number and used the card for groceries and other needs. *Id.* ¶¶ 7-8. She asserts that had she received any insert stating that Netspend was involved with the card, she "never would have used it" as her "entire reason for . . . [seeking] a card from PayPal was to get away from Netspend." *Id.* ¶ 6.

Morehouse lost her card in March 2020. *Id.* ¶ 9. She called the customer service number listed on the card and on PayPal's website twenty times over the next three months, but the call dropped each time, either immediately or following transfers. *Id.*; Compl. ¶¶ 2, 35. She also emailed PayPal customer service fourteen times between March and June 2020. Compl. ¶ 41. These emails led to what can only be described as a series of Kafkaesque communications with customer service representatives, none of which resolved Morehouse's issues. *See id.* ¶¶ 42-49. Morehouse was not able to have her SSA payments transferred to another card without PayPal formally rejecting the payments, which did not occur because Morehouse was not able to "connect meaningfully with anyone at PayPal." *Id.* ¶ 40. During this period, Morehouse suffered significant financial hardship and emotional distress. *Id.* ¶¶ 32-37.

Only after Morehouse acquired an attorney did she learn "that Netspend was the company responsible for customer service" on the card. Morehouse Dec. ¶¶ 11-12; Compl. ¶ 51. She asserts that if she had known Netspend would be involved in customer service, she "would not have accepted the terms of the [PayPal] user agreement." Morehouse Dec. ¶ 13. Morehouse also learned that Defendants had been collecting monthly fees, which allegedly had not been disclosed to her and contradicted PayPal's advertisements and the online fee schedule. Compl. ¶ 52.

Morehouse sued Defendants under the EFTA and TILA for failure to investigate, disclose fees, and provide correct error resolution information, as well as under the NYDPA for publishing misleading customer service information, and for negligent misrepresentation.

## II.   The Arbitration Agreements

Morehouse's PayPal card was issued by Bancorp and administered by Netspend, pursuant to agreements between Netspend and PayPal and between Netspend and Bancorp. Lyle Dec. ¶ 2. Defendants describe two contracts that Morehouse entered into when acquiring and activating her card, each with its own arbitration provision: a User Agreement and a Cardholder Agreement.

> A declaration from PayPal's Executive Escalations Legal Specialist explains that
>
> In order to create a PayPal account, an individual who is a prospective PayPal user must complete a registration process at PayPal's website located at http://www.paypal.com. In order to complete the registration process, such prospective user must accept PayPal's User Agreement (the "User Agreement"). In order to accept the User Agreement, such prospective user must affirmatively click a button on the registration page acknowledging his or her assent. If a prospective user chooses not to accept the terms of the User Agreement, he or she cannot complete the registration process or create a PayPal account.

Leckron Dec. ¶ 4. The first page of that agreement states that its "terms include an agreement to resolve disputes by arbitration." *Id.* Ex. 1 at 1. The agreement's arbitration clause itself provides:

> You and PayPal each agree that any and all disputes or claims that have arisen or may arise between you and PayPal, including without limitation federal and state statutory claims, common law claims, and those based in contract, tort, fraud,

3

>  misrepresentation or any other legal theory, shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify and so long as the matter remains in such court and advances only on an individual (non-class, non-representative) basis. This Agreement to Arbitrate is intended to be broadly interpreted.

*Id.* at 38. The User Agreement allows customers to opt out of the arbitration agreement by mailing a notice within 30 days. *Id.* at 40. PayPal's records indicate that Morehouse accepted the User Agreement on February 19, 2020 and did not opt out of arbitration. Leckron Dec. ¶¶ 7, 12.

Defendants also submitted declarations from James Lyle, Netspend's Regulatory Compliance Specialist and Cardholder Litigation Manager. Lyle affirmed that "[w]hen Netspend mails a card to a new cardholder the mailing envelope includes the Card along with a paper copy of [a] Cardholder Agreement," among other documents. Lyle Dec. ¶ 4. Accordingly, "[w]hen Morehouse received her debit card," "it was accompanied by the Cardholder Agreement." *Id.* ¶ 5. Although there is no one who could attest to the particular mailing of Morehouse's materials because the mailing process is automated, Lyle affirmed that "Netspend does not send any initial card without the accompanying Cardholder Agreement, [that] it is the standard policy and practice of Netspend to furnish those materials together," and that he has "no reason to believe there was any deviation from that practice with respect to Morehouse's Card." Supp. Lyle Dec. ¶¶ 5-6.

The Cardholder Agreement creates a contract between a user and Bancorp, along with Bancorp's successors, affiliates, and assignees. *See* Lyle Dec. Ex. B ("Cardholder Agreement") at 4 ("'We,' 'us,' and 'our' mean the Issuer, our successors, affiliates or assignees."). It explains that "[b]y activating or loading the Card, you agree to be bound by the terms and conditions contained in this Agreement." *Id.* It also provides, in bold text, that "**[t]his Cardholder Agreement contains an Arbitration Clause requiring all claims to be resolved by way of binding arbitration.**" *Id.* at 3. The arbitration clause itself provides that the following claims

will be finally and exclusively resolved by binding arbitration conducted by the American Arbitration Association ("AAA"):

> Any claim, dispute, or controversy ("Claim") arising out of or relating in any way to: i) this Agreement; ii) your Card; iii) the Cards of any additional Cardholders designated by you, if any; iv) your acquisition of the Card; v) your use of the Card; vi) the amount of available funds in the Card Account(s); vii) advertisements, promotions or oral or written statements related to the Card(s), as well as goods or services purchased with the Card(s); viii) the benefits and services related to the Card(s); or ix) transactions on the Card(s).

*Id.* at 15-16. It warns: "**IF YOU DO NOT AGREE TO THE TERMS OF THIS ARBITRATION AGREEMENT, DO *NOT* ACTIVATE OR *USE* THE CARD.**" *Id.* at 16.

The Cardholder Agreement informs customers that they can "[c]ontact Netspend" at the same customer service number that was printed on the PayPal card. *Id.* at 3; Morehouse Dec. ¶ 10. It also explains that "Netspend"[] is an authorized Independent Sales Organization pursuant to an agreement with The Bancorp Bank," that "[i]n order to offer the Card, PayPal has contracted with Netspend and The Bancorp Bank," and that "[a]ny request for a Card will be processed by Netspend, acting on behalf of the Issuer." Cardholder Agreement at 4.

According to Netspend's records, Morehouse activated her card on March 2, 2020. Lyle Dec. ¶ 3 & Ex. A. "[I]n order to complete the card activation process, Morehouse was required to acknowledge the Cardholder Agreement." *Id.* ¶ 7. Specifically, when a user activates her card by phone, as Morehouse did, she hears a voice prompt stating: "Before you can activate your card, you must read and accept the card holder agreement. Press 1 if you accept our terms." Supp. Lyle Dec. ¶¶ 12-13. Netspend's phone records show that Morehouse "acknowledged and agreed to the terms of the Cardholder Agreement by telephone" in accordance with those prompts. *Id.* ¶¶ 14-15 & Ex. B; Lyle Dec. Ex. A. at 1.

## LEGAL STANDARD

The Federal Arbitration Act (FAA) provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Enacted to "revers[e] centuries of judicial hostility to arbitration agreements," *Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 119 (2d Cir. 1991), the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).[2] Accordingly, an agreement to arbitrate is like any other contract in that individuals are not required to arbitrate "when they have not agreed to do so." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). In deciding whether a dispute must be arbitrated, courts must determine: (1) "whether the parties agreed to arbitrate"; (2) if so, "the scope of that agreement"; (3) "if federal statutory claims are asserted . . . whether Congress intended those claims to be nonarbitrable"; and (4) if "some, but not all, of the claims in the case are arbitrable . . . whether to stay the balance of the proceedings pending arbitration." *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004). "Whether or not the parties have agreed to arbitrate is a question of state contract law." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012).

"In deciding motions to compel [arbitration], courts apply a standard similar to that applicable for a motion for summary judgment." *Nicosia*, 834 F.3d at 229. A court must therefore "consider all relevant, admissible evidence submitted by the parties," including affidavits, and "draw all reasonable inferences in favor of the non-moving party." *Id.*

---

[2] Unless otherwise noted, case quotations omit all internal quotations, citations, alterations, and footnotes.

6

**DISCUSSION**

**I.      Plaintiff Has Agreed to Arbitrate Her Claims**

Morehouse argues that no valid contract was formed through the Cardholder Agreement because she never received a copy of that Agreement and did not agree to its terms. This theory does not pass muster.[3]

"[I]f the dispute at issue concerns either contract formation or whether parties have agreed to submit a particular dispute to arbitration, the court must make an initial determination prior to compelling arbitration." *Velez v. Credit One Bank*, No. 15-cv-4752 (PKC), 2016 WL 324963, at *1 (E.D.N.Y. Jan. 25, 2016). In deciding whether a contract was formed, the Court applies New York law, rather than the law provided the Cardholder Agreement's choice-of-law clause. *See Schnabel*, 697 F.3d at 119 ("Applying the choice-of-law clause [in a contract] to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."); *see also Biggs v. Midland Credit Mgmt., Inc.*, No. 17-cv-340 (JFB)

---

[3] The Court addresses only the Cardholder Agreement, and not the User Agreement, because it finds that all of Plaintiff's claims are covered by the Cardholder Agreement's arbitration clause, *see infra* Part II, and that all Defendants, including non-signatory PayPal, may compel Plaintiff to arbitrate her claims against them pursuant to the Cardholder Agreement. "Under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed . . . and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126-27 (2d Cir. 2010). "[I]n addition to the 'intertwined' factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008). The Second Circuit "has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities," *Ross v. Am. Exp. Co.*, 547 F.3d 137, 144 (2d Cir. 2008); *accord Hoffman v. Aaron Kamhi, Inc.*, 927 F. Supp. 640, 643 (S.D.N.Y. 1996) (explaining that a non-signatory may benefit from an arbitration agreement when "the legal basis for, and the factual context of, the claims alleged against the non-signatory are the same as the claims alleged against the signatory where the non-signatory is the disclosed agent or principal of the signatory"), as well as in cases where "during the time period at issue in the complaint, the *plaintiffs themselves* treated the signatory and non-signatory corporate affiliates as at least somewhat interchangeable with respect to the plaintiffs' rights and responsibilities under the relevant contract," *Medidata Sols., Inc. v. Veeva Sys. Inc.*, 748 Fed. App'x 363, 366-67 (2d Cir. 2018). Reviewing the facts pleaded and issues raised by Plaintiff and the relationship among the parties, the Court concludes that PayPal may compel Plaintiff to arbitrate her disputes under the Cardholder Agreement. It must, of course, comply with the terms of the Cardholder Agreement's arbitration provision, including the Agreement's provision regarding payment of the initial filing fees associated with Plaintiff's arbitration.

(ARL), 2018 WL 1225539, at *6 (E.D.N.Y. Mar. 9, 2018) (applying New York law in assessing the existence of a contract because that is where the "plaintiff received the Account Agreement and account statements," despite the contract's choice of Utah law).

Defendants have proffered evidence that Netspend's standard practice is to send the Cardholder Agreement to a user along with the card itself. Lyle Dec. ¶ 4; Supp. Lyle Dec. ¶ 5. Such evidence of regular procedures establishes a presumption of receipt. *See, e.g.*, *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010) ("[A] presumption of receipt arises where . . . the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed."); *accord Weiss v. Am. Express Nat'l Bank*, No. 19-cv-4720 (JPO), 2020 WL 6807628, at *2 (S.D.N.Y. Nov. 18, 2020) ("Under New York law, there is a rebuttable presumption that a letter which is mailed is received by the addressee, and proof of mailing may be established . . . by showing that it was the regular office practice and procedure to mail such a letter.").[4] In response, Morehouse does not affirmatively deny receiving the Cardholder Agreement; she merely states that she does not recall receiving it. Morehouse Dec. ¶ 6 ("I don't believe I received any inserts."). Such an equivocal statement is insufficient to rebut the presumption of receipt. *See Moise v. Fam. Dollar Stores of New York, Inc.*, No. 16-cv-6314 (RA), 2017 WL 2378193, at *3 (S.D.N.Y. June 1, 2017) ("Moise's claim that he does not 'recall' receiving the Agreement does not create a genuine dispute as to whether

---

[4] Plaintiff relies on *Matter of Frankel v. Citicorp Ins. Servs., Inc.*, 80 A.D.3d 280 (N.Y. App. Div. 2010). There, the court concluded that a defendant's statements "that Citibank 'caused to be mailed' the arbitration change-in-terms and that Citibank's records 'reflected' that the 2002 credit card agreement had been mailed to the plaintiff were conclusory and otherwise insufficient to establish office practice . . . geared so as to ensure the likelihood that the documents were always properly addressed and mailed." *Id.* at 284. Here, by contrast, Lyle's declaration establishes regular office practice by specifically explaining that "[w]hen Netspend mails a card to a new cardholder the mailing envelope includes the Card along with a paper copy of the Cardholder Agreement," that "Netspend does not send any initial card without the accompanying Cardholder Agreement, and it is the standard policy and practice of Netspend to furnish those materials together," and that he has "no reason to believe there was any deviation from that practice with respect to Morehouse's Card." Supp. Lyle Dec. ¶ 5.

he signed it. It is well-established that a mere assertion that one does not *recall* signing a document does not, by itself, create an issue of fact as to whether a signature on a document is valid."); *Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F. Supp. 2d 457, 464 (S.D.N.Y. 2004) (concluding that a plaintiff received an agreement in part because he "[did] not ever actually deny receiving the agreement; he only state[d] somewhat equivocally that 'I don't believe I even received' it").

Separately, there is no question that Plaintiff assented to the terms of the Cardholder Agreement by activating and using her card. Supp. Lyle Dec. ¶¶ 14-15; Lyle Dec. Ex. A. at 1; Morehouse Dec. ¶ 8. Each of these actions independently manifested her assent to the terms of the Cardholder Agreement, even if she may not have read it. *See, e.g.*, *Weiss*, 2020 WL 6807628, at *2 ("[I]t is clear under New York law that regular use of a credit card constitutes sufficient evidence of the card user's consent to the terms of the agreement governing the account."); *Carr v. Credit One Bank*, No. 15-cv-6663 (LAK), 2015 WL 9077314, at *2 (S.D.N.Y. Dec. 16, 2015) ("Under New York law, the acceptance and use of a credit card demonstrates acceptance of the conditions in a Cardholder Agreement. Thus, even if plaintiff never signed an agreement, her use of the credit card . . . manifested her intent to be bound by the Cardholder Agreement."); *id.* ("[O]ne who . . . accepts a written contract . . . is conclusively presumed to know its contents and to assent to them."); *Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 190 (N.Y. App. Div. 2004) (finding that a plaintiff was bound by an arbitration provision "by continuing to use her credit cards . . . even if she did not read it").[5]

Accordingly, Plaintiff assented to the Cardholder Agreement and its arbitration agreement.

---

[5] Plaintiff does not argue that this rule should not apply to prepaid debit cards on which a user does not make payments.

## II. Plaintiff's Claims Are Subject to the Arbitration Agreement

"[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008). Accordingly, "[a]rbitration should be compelled unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir. 1991).

Plaintiff does not argue her claims are beyond the scope of the arbitration clause. Nor would such an argument prevail. Pursuant to the Cardholder Agreement, the parties to it agree to arbitrate "[a]ny claim, dispute, or controversy ('Claim') arising out of or relating in any way to: i) this Agreement; ii) your Card," or "advertisements, promotions or oral or written statements related to the Card[]." Cardholder Agreement at 15-16. Plaintiff's claims that Defendants failed to investigate, failed to disclose fees, failed to provide accurate information for reporting a lost card, improperly failed to inform her about Netspend's role in serving the card, and made misleading statements on that same issue, are all clearly encompassed by the broad language of the arbitration agreement.

## III. Plaintiff's Federal Statutory Claims May Be Vindicated in the Arbitral Forum

Even "where an arbitration agreement requires the arbitration of disputes involving a federal statute, the parties to a valid arbitration agreement are compelled to arbitrate 'so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum.'" *Kurz*, 319 F. Supp. 2d at 460 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)). "[T]he party opposing an otherwise valid arbitration agreement bears the burden of showing Congressional intent to create nonwaivable rights to a judicial forum." *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 259-60 (S.D.N.Y. 2005).

Plaintiff does not contend that Congress intended to create nonwaivable rights to a judicial forum in either the TILA or the EFTA such that any agreement to arbitrate those claims is invalid. Nor would such an argument prevail. "Numerous courts . . . have concluded that compulsory arbitration under the FAA is not inherently inconsistent with the TILA enforcement scheme." *Hale v. First USA Bank, N.A.*, No. 00-cv-5406 (JGK), 2001 WL 687371, at *7 (S.D.N.Y. June 19, 2001) (collecting cases and concluding that a plaintiff's TILA claims were arbitrable); *see also Kurz*, 319 F. Supp. 2d at 467 (granting motion to arbitrate TILA claim without specifically discussing the vindication question). Courts have reached similar conclusions regarding claims brought under the EFTA. *See, e.g.*, *Howse v. DirecTV, LLC*, 221 F. Supp. 3d 1339, 1345-46 (M.D. Fla. 2016); *Williams v. Champs Auto Sales, Inc.*, No. 14-cv-12866 (MFL), 2014 WL 6886546, at *2 (E.D. Mich. Dec. 4, 2014); *see also Xue Qin Liu v. TD Ameritrade, Inc.*, No. 18-cv-6764 (NGG) (CLP), 2020 WL 2113219 (E.D.N.Y. May 4, 2020) (granting motion to arbitrate EFTA claim without specifically discussing the vindication issue). The Court agrees with the reasoning of these cases and sees no inherent incompatibility between the rights guaranteed by the TILA and EFTA and arbitration of Plaintiff's individual claims.[6]

### IV.  Plaintiff's Unconscionability Arguments Are Reserved for the Arbitrator

"[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010). But just as parties may agree to arbitrate the merits of their disputes, so too may

---

[6] The EFTA and TILA provide for attorney's fees to a prevailing party. 15 U.S.C. § 1693m(a)(3); § 1640(a)(3). The AAA's consumer rules, however, state that "[t]he arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law or laws that apply to the case." *American Arbitration Association, Consumer Arbitration Rules* at 7, https://www.adr.org/sites/default/files/Consumer_Rules_Web_2.pdf. Because the arbitration agreement is silent as to attorneys' fees, the Court presumes that Plaintiff will receive attorney's fees if she prevails on her federal statutory claims. *Cf. Zambrano v. Strategic Delivery Sols., LLC*, No. 15-cv-8410 (ER), 2016 WL 5339552, at *6 (S.D.N.Y. Sept. 22, 2016) (finding that an arbitration agreement requiring parties to bear their own attorney's fees and costs on FLSA claims prevented plaintiffs from vindicating their rights, as the FLSA allows prevailing parties to recover attorneys' fees).

11

they agree to arbitrate "'gateway' questions of 'arbitrability.'" *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). Courts assume parties intended to arbitrate arbitrability only when "there is clear and unmistakable evidence that they did so." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019). Such evidence is found through "[b]road language expressing an intention to arbitrate all aspects of all disputes," or a delegation provision. *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019).

When a delegation provision exists, "a court may not intervene unless a party challenges the delegation provision specifically." *Bolden v. DG TRC Mgmt. Co., LLC*, No. 19-cv-3425 (KMW), 2019 WL 2119622, at *6 (S.D.N.Y. May 15, 2019); *see Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 487 (S.D.N.Y. 2008) ("[I]t is well established that a challenge of unconscionability to the whole contract, as opposed to the arbitration provision specifically, is an arbitrable matter not properly considered by a court."); *Rent-a-Center*, 561 U.S. at 70 ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").

Here, the Cardholder Agreement clearly delegates questions of arbitrability to the arbitrator. *See* Cardholder Agreement at 15-16 (referring to arbitration "[a]ny claim, dispute, or controversy ('Claim') arising out of or relating in any way to: i) this Agreement; ii) your Card," and a host of other issues); *id.* ("All determinations as to the scope, interpretation, enforceability and validity of this Agreement shall be made final exclusively by the arbitrator."); *Bolden*, 2019 WL 2119622, at *4 (collecting cases holding that such language expresses clear intent to delegate arbitrability). Thus, the Court may only consider Plaintiff's unconscionability arguments to the extent they attack the delegation provision itself.

Plaintiff argues that she had no choice to enter into the agreement because she could not access her benefits without doing so; that the costs of arbitration will be prohibitive given her lack of income; that Defendants "surreptitiously force[d]" her to enter a contractual relationship with Netspend by deliberately creating confusion as to the card's servicer; and that the Cardholder Agreement's procedures for opting out of arbitration and of the Cardholder Agreement more broadly are unconscionable. None of these arguments target the delegation provision specifically—indeed, Plaintiff "does not mention the delegation provision at all." *Moise*, 2017 WL 2378193, at *5.[7] Accordingly, "the Court must enforce the delegation provision and refer the question[s] of unconscionability to the arbitrator." *Id.*; *see Foran v. Nat'l Football League*, No. 18-cv-10857 (ALC), 2019 WL 2408030, at *3 (S.D.N.Y. June 7, 2019) (declining to consider an argument that "concern[ed] the fees and cost provision of the arbitration agreements and not the delegation of authority to the arbitrator" because the delegation clauses required "the arbitrator [to] resolve the arbitrability issues including scope, validity and enforceability").[8]

---

[7] To the extent Plaintiff's lack of choice argument may be read to assert lack of choice in accepting the delegation provision specifically, it fails. "Plaintiff fails to show that she lacked a meaningful choice in choosing Defendant[s'] credit card services. There is no evidence that Defendant[s] engaged in high-pressure sales tactics to induce Plaintiff to agree to the terms of the Cardholder Agreement or even to activate her card, nor is there anything to suggest that Plaintiff was in any way compelled to apply for or use Defendant[s'] credit card in particular." *Velez*, 2016 WL 324963, at *5. (Although Delaware law would appear to apply to any enforceability challenge to the Cardholder Agreement, which selects Delaware law, *see* Cardholder Agreement at 13, Delaware and New York law are similar on this issue of unconscionability such that the Court may consider New York law, *see Anonymous v. JP Morgan Chase & Co.*, No. 05-cv-2442 (JGK), 2005 WL 2861589, at *5 (S.D.N.Y. Oct. 31, 2005).)

[8] To be sure, some courts have treated arguments about the prohibitive costs of arbitration as relevant to a plaintiff's ability to effectively vindicate her rights in arbitration. *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125-126 (2d Cir. 2010) (explaining that an arbitration agreement with "a fee-shifting provision that requires that fees be awarded to the prevailing party" would "significantly diminish a litigant's rights under Title VII"); *Zambrano v. Strategic Delivery Sols., LLC*, No. 15-cv-8410 (ER), 2016 WL 5339552, at *5 (S.D.N.Y. Sept. 22, 2016) (describing potential situations in which the "filing and administrative fees attached to arbitration . . . are so high as to make access to the forum impracticable"). But here, Plaintiff explicitly frames her fee argument as going to unconscionability, not to effective vindication. Even if Plaintiff had so framed that argument, it would still be reserved for the arbitrator because it does not specifically challenge the delegation provision. *See, e.g.*, *Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 604 (S.D.N.Y. 2020) ("It makes no difference that the employee in *Rent-A-Center* argued that the arbitration agreement was void under the state law contract principle of unconscionability, while the plaintiff in this case argues that the Agreement is void under the federal, judge-made doctrine of 'effective vindication.' The Supreme Court in *Rent-A-Center* made clear that the relevant distinction is between challenges to a delegation provision

**V.     Stay**

The FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay [is] requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015). Given PayPal's request for a stay, this case is stayed pending arbitration of Plaintiff's claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is granted and this case is stayed. The Clerk of Court is respectfully directed to terminate the motions at docket numbers 26 and 30.

SO ORDERED.

Dated: March 28, 2022
New York, New York

                                                        Hon. Ronnie Abrams
                                                        United States District Judge

---

specifically, which the Court can entertain notwithstanding the existence of a delegation provision, and challenges to an arbitration agreement as a whole, which must be submitted to the arbitrator in the face of a valid delegation provision. . . . Because the plaintiff's challenge in this Court is clearly directed at the Agreement as a whole, and not at the delegation provision specifically, the plaintiff's 'effective vindication' challenge to the Agreement . . . must be submitted to the arbitrators under *Rent-A-Center* and the plain language of the delegation provision.").